## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 786-734-4433 | Case No.: **4:21mj242-MAF**<br><br>**Under Seal** |

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

Your affiant, Patrick N. Sanford, being first duly sworn, hereby deposes and states as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant makes this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned with call number **786-734-4433** (the "**TARGET PHONE**"), whose provider is Verizon Wireless, a wireless communications service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The **TARGET PHONE** is described herein in Attachment A and the location information to be seized is described in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18



U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.     Your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Your affiant is a Special Agent with the Federal Bureau of Investigation ("FBI") and has been so employed for approximately twenty-two (22) years. Your affiant is currently assigned to the Jacksonville Field Office, Tallahassee Resident Agency. As part of my duties, your affiant investigates crimes including but not limited to Hobbs Act robberies, bank robberies, computer related crime, fraud, public corruption, national security matters, and several others. Your affiant received training on the proper investigative techniques for these violations, including the application and execution of arrest and search warrants. Your affiant has conducted and assisted in hundreds of criminal investigations and has been the affiant or has been involved in dozens of search warrants that have led to the seizure of evidence related to violent crime. Prior to working as an FBI Special Agent, your affiant was a police officer in Montgomery, Alabama, from 1995 to 1999.

4. This affidavit is based upon my personal knowledge; my review of documents and other evidence; and my conversations with other law enforcement officials. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that your affiant has learned during this investigation.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2113 (Bank Robbery) has been committed by Johnson Saint-Louis, DOB 11/15/1984 (hereinafter "SAINT-LOUIS"). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of Bank Robbery and will lead to the identification of individual(s) who were engaged in the commission of this offense.

6. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. On September 29, 2021, at approximately 11:00 p.m., the Tallahassee Police Department ("TPD") responded to a report of an armed robbery of an automated teller machine ("ATM") technician who was working on the ATM at the

Bank of America ("BOA") located at 5676 Thomasville Road, Tallahassee, Florida 32312.[1]

8.      The ATM technician arrived at the ATM at approximately 10:31 p.m. and was fixing a jam on the cash dispense part of the ATM.  The technician had removed all five cassettes that contained the cash for ATM withdrawals and stacked them in the ATM lane in front of the machine to look for a part that broke, which caused a belt to slip.

9.      While the technician was looking inside the machine, at approximately 10:53 pm, a male suspect approached and pointed a gun at him.  The suspect told the technician to sit down, turn around and not to look at him.  The suspect was armed with a black handgun.  The technician walked to the other side of a brick column by the ATM lane while the suspect began opening the cassettes and removing the cash. The technician stated when he realized the suspect wasn't holding the gun anymore, he started to run and scream for help. This caused the suspect to grab the remaining three cash boxes and run northbound through Barrington Park Condominiums.

10.      A TPD K-9 conducted a track through the complex and ended at 2750 Chancellorsville Dr., a parking lot for a commercial building.  A search of the area

---

[1] BOA is a "bank" as defined in 18 U.S.C. § 2113(f) because its deposits are insured by the Federal Deposit Insurance Corporation.

was conducted after the K-9 track, but no items of evidence were located. BOA provided initial screen shots of the suspect and victim during the armed robbery. The suspect got away with approximately $104,840 from the ATM.   The suspect was described as a black male, approximately 6'0"-6'2" tall, athletic build, wearing a black hoodie, black pants and shoes, and black COVID-19 style mask.

11.    Upon further analyzing the security video from earlier in the evening, an individual wearing a black baseball hat with a Miami Dolphins logo and a black COVID-19 mask drives up to the ATM in what appears to be a newer model grey Chevrolet Malibu.  This individual conducts an ATM transaction where currency was dispensed, then he can be seen jamming currency back into feeder slot.  This individual does this three times in a row, and on the third time, it appears the currency does not come back out of the slot.   Subsequently, the ATM showed a feed error, causing the technician to be notified.  In response to a federal grand jury subpoena, BOA corporate security identified that the account being accessed during these transactions belonged to SAINT-LOUIS.

12.    BOA Corporate Security conducted further investigation of SAINT-LOUIS's account and located an ATM cash deposit transaction the day following the robbery on September 30, 2021, at approximately 8:47 a.m. at the BOA ATM in Pembroke Pines, Florida.  Upon reviewing video surveillance of the transaction, a black male wearing what appears to be the same black baseball hat with the Miami

Dolphins logo and driving what appears to be the same grey Chevrolet Malibu, conducts a transaction wherein he deposits U.S. currency. When the subject first pulls up to the ATM, he is not wearing any facial covering, only the baseball hat. As the subject begins the transaction, he puts on a COVID-19 style mask that covers his nose and mouth.

13.     BOA Corporate Security also located another cash deposit transaction on the same account belonging to SAINT-LOUIS the following day on October 1, 2021, at approximately 11:36 p.m. This transaction was at the BOA ATM in Deerfield Beach, Florida. Upon viewing the video surveillance, a black male with dreadlocks drives up to the ATM in a white Mercedes SUV without any face covering, only wearing a hat. As the subject starts making a transaction, he then puts a COVID-19 style mask over his nose and mouth.

14.     Your affiant conducted a search of the Florida Department of Highway Safety Vehicle ("DHSMV") database and located a Florida driver's license for SAINT-LOUIS. Your affiant compared the driver's license photograph of SAINT-LOUIS and the surveillance footage of the subject driving the grey Chevrolet at the Pembroke Pines BOA ATM, and the white Mercedes SUV at the Deerfield Beach BOA ATM, and it appears to be the same person. The Florida DHSMV database also revealed that SAINT-LOUIS has a 2016 white Mercedes SUV registered in his name.

15.    Your affiant identified a similar bank robbery which occurred at a BOA ATM on February 16, 2021, in Longwood, Florida, just outside of Orlando.   The modus operandi was the same and a subject was observed on BOA surveillance video approaching the ATM on foot and tampering with the ATM prior to the service call being generated.   Surveillance video also revealed a white Mercedes SUV with the same Florida license plate that is registered to SAINT-LOUIS, drive through the parking lot of the bank prior to seeing the individual on foot approach and tamper with the ATM. Subsequently, an ATM technician responded to a service ticket and was approached by a subject with a gun.   The subject took approximately $130,000 from this robbery.

16.    Your affiant conducted database research on SAINT-LOUIS, which revealed he was employed with Nautilus Hyosung, who builds and maintains bank ATMs utilized by BOA and other banks.   Your affiant also learned that SAINT-LOUIS was employed as a technician from 2012 through 2019, during which he serviced ATMs at financial institutions.   SAINT-LOUIS was investigated by the company along with Chase Bank for illegally accessing over 50 ATMs which resulted in approximately $292,000 in missing currency.   SAINT-LOUIS was fired from the company in approximately May 2019.

17.    SAINT-LOUIS's bank account information listed his telephone number as the **TARGET PHONE**.   Several other database checks also revealed that

SAINT-LOUIS has utilized the **TARGET PHONE** for several years. Verizon also confirmed that the **TARGET PHONE** is registered to SAINT-LOUIS.

18. Based on my training and experience, your affiant knows that individual(s) involved in bank robberies often use and/or spend the robbed cash shortly after the robbery, and that such behavior may constitute evidence of such robbery.

## CELLULAR DEVICE LOCATION INFORMATION

19. In my training and experience, your affiant has learned that Verizon Wires is a company that provides cellular communications service to the general public. Your affiant also knows that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular device itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers

are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

20. Based on my training and experience, your affiant knows that Verizon Wireless can collect cell-site data about the **TARGET PHONE**. Based on my training and experience, your affiant knows that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. Your affiant also knows that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

21. Based on my training and experience, your affiant knows each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number

9

("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

22.    Based on my training and experience, your affiant knows that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  Your affiant also knows that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET PHONE's** user(s) and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

23.     Based on the foregoing, your affiant requests that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

24.     Your affiant further requests, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the Warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the Warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET PHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the Warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the Warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

25.     Your affiant further requests that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within its possession, custody, or control. Your affiant also requests that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the **TARGET PHONE** on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

26.     Your affiant further requests that the Court authorize execution of the Warrant at any time of day or night, owing to the potential need to locate the **TARGET PHONE** outside of daytime hours.

Respectfully submitted,

_____
Patrick N. Sanford
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on this __13__ day of October 2021.

_____
MARTIN A. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A

### Property to be Searched

The cellular device assigned call number **786-734-4433** (the "**TARGET PHONE**"), whose wireless service provider is Verizon Wireless, a wireless communications service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921.

Records and information associated with the **TARGET PHONE** that is within the possession, custody, or control of Verizon, including information about the location of the **TARGET PHONE** if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

All information about the location of the **TARGET PHONE** described in Attachment A for a period of **forty-five (45) days**, during all times of day and night. "Information about the location of the **TARGET PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon, Verizon is required to disclose the Location Information to the government. In addition, Verizon must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the **TARGET PHONE** on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

The government shall compensate Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

This Warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 2113 (Bank Robbery) involving JOHNSON SAINT-LOUIS and/or unidentified subjects.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.